IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | 1:15-cr-223 |
| | : | |
| v. | : | 1:19-cv-415 |
| | : | |
| JOAN CICCHIELLO, | : | Hon. John E. Jones III |
| Defendant. | : | |

# MEMORANDUM

### March 11, 2021

Presently pending before the Court is Defendant Joan Chicchiello's 28 U.S.C. §2255 Motion ("the Motion"). (Doc. 110). For the reasons that follow we shall deny the motion.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On September 23, 2015, Defendant was charged in a multi-count indictment with healthcare fraud (Count 1) and fourteen counts of false writings related to a health care matter (Counts 2-15). (Doc. 1). Defendant was initially represented by Gary Katz, (Doc. 15), but the relationship soured, and he withdrew as counsel on July 5, 2016. (Docs. 26, 29, 34). Thereafter, Chris Lovecchio entered his appearance on behalf of Defendant. (Docs. 35, 37). On October 20, 2016, the Government filed a Superseding Indictment, which added additional false writings allegations at Counts 16-38 and obstruction of a federal audit at Count 39. (Doc. 46).

On October 5, 2017, Defendant pleaded guilty to Count One of the Superseding Indictment. (Docs. 74, 76-77). During that proceeding, the following exchange occurred between Defendant and the Court:

> THE COURT: Okay. You're not taking anything that would affect your ability to understand what's taking place?
> DEFENDANT: No.
> THE COURT: And have you had enough time to go over these charges with Mr. Lovecchio before today?
> DEFENDANT: Yes.
> THE COURT: Are you satisfied with his representation of you up to this point?
> DEFENDANT: Yes.
> THE COURT: And has he answered all the questions that you have had about the legal effect of these charges?
> DEFENDANT: Yes.
>
> [. . .]
>
> THE COURT: [I]t if at the conclusion of the proceeding today I accept your plea, there will not be a trial, and you will have given up that constitutional right. Do you understand that?
> DEFENDANT: Yes.
> THE COURT: Is it your desire to do that?
> DEFENDANT: Yes.
> THE COURT: And do you understand that you don't have to plead guilty, you have the full right to go to trial?
> DEFENDANT: Correct, yes.
> THE COURT: All right. Now there is a plea agreement in this case, and the plea agreement consists of 38 pages. And I'm going to ask Mr. Lovecchio if he would direct your attention to page 37 of the plea agreement. It appears that your signature is affixed there. Is that correct?
> DEFENDANT: Yes.
> THE COURT: Now before you signed that, did you read over all 44 paragraphs in the preceding pages?
> DEFENDANT: Yes.

| | |
|---|---|
| THE COURT: | Did Mr. Lovecchio explain the legal effect of this agreement to you before you signed it? |
| DEFENDANT: | Yes. |
| THE COURT: | And are you telling me that he answered any questions that you had about the legal effect? |
| DEFENDANT: | Yes. |
| THE COURT: | You're in full agreement with this, is that correct? |
| DEFENDANT: | Yes. |

(Doc. 136 at 4:7-4:18; 6:3-7:4). Following this colloquy, the Assistant United States Attorney, Joseph Terz, summarized the following salient portions of the plea agreement:

1. Defendant agreed to plead guilty to Count One of the Superseding Indictment;

2. The maximum penalties provided by law were ten years imprisonment, a term of supervised release up to three years, a fine of up to $250,000.00, a special assessment of $100.00, and the loss of certain federal benefits;

3. The Court was not a party to the plea agreement and was thus not bound by its terms; and

4. The plea agreement contained specific guideline recommendations which would impact her Guideline Range.

(*Id.* at 6-10). Defendant confirmed, on the record, that these were the correct terms of her plea agreement. (*Id.* at 10:2). She further acknowledged that she was not promised anything beyond the terms of the plea agreement to secure her guilty

plea. (*Id.*at 10:13-10:20). Finally, she confirmed that she understood that the Court could sentence her up to the maximum term of imprisonment. (*Id.* at 11:2-11:7).

On May 9, 2018, the Court sentenced Defendant to 72 months imprisonment and ordered her to pay $155,122.17 in restitution, along with a $150,000.00 fine. Defendant timely moved for relief under 28 U.S.C. §2255 on March 7, 2019, alleging that her attorney promised her she would receive six months' probation. (Doc. 110; Doc. 128 at 3). After several extensions, Defendant filed her brief in support on September 30, 2019. (Doc. 128). The Government filed a brief in opposition on December 17, 2019. (Doc. 135). Defendant replied on January 21, 2020. (Doc. 137). On January 27, 2020, we granted Defendant's request for an evidentiary hearing and scheduled that proceeding to occur on April 22, 2020. (Doc. 138). Thereafter, the coronavirus pandemic struck. As a result, Defendant sought release under the CARES Act. (Doc. 140). But before we could consider this request, the Bureau of Prisons independently released Defendant to home confinement because she met the Attorney General's newly propagated guidance in response to COVID-19. (Doc. 144).

Despite being released to home confinement, Defendant wished to continue pursuing her §2255 motion, as is her right. We thus held an evidentiary hearing on August 17, 2020. (Doc. 147). The transcript of that hearing was filed on September

16, 2020. (Doc. 149). We glean the following from that hearing and the briefs filed by both parties:

Defendant testified that she first met with Mr. Lovecchio on September 27, 2017 to discuss her plea agreement ("the Agreement"). (Doc. 149 at 5:14- 5:25). During that conversation, Defendant avers that she was presented with a choice: trial and 20-30 years imprisonment or the Agreement and six months' probation. (*Id*. at 6:8-6:18). She also maintains that she was told she had to sign the Agreement that day because it was already "late." (*Id.* at 6:20-6:23). Defendant further notes that, before she signed the Agreement, she was prepared to go to trial, but that Mr. Lovecchio changed her mind. (*Id.* at 7:3-7:20). She also testified that she has no recollection of her guilty plea or any questions asked of her by this Court. (*Id*. at 8:11-8:16). She further maintains that she was told to agree with "the judge" so she didn't "screw it up." (*Id.*). Finally, Defendant stated that she did not understand the sentencing guidelines or her statutory maximum terms of imprisonment and would have gone to trial had she understood that she was not promised a sentence of six months' probation. (*Id*. at 10:7-11:10).

Defendant also produced the affidavit and testimony of her unindicted co-conspirator, John J.P. Baski. (Doc. 85 at ¶ 9; Doc. 110-1; Doc. 149 at 32:12-). In his affidavit, Mr. Baski recounts traveling to Mr. Lovecchio's office with the Defendant the day she signed the Agreement. (Doc. 110-1 at 1). He maintains that

5

Defendant did not want to sign the Agreement, instead asking what had happened to the version negotiated by her former lawyer, Gary Katz. (*Id.*). Mr. Baski claims that Defendant asked Mr. Lovecchio to renegotiate the plea agreement at that time. (*Id.*). According to Mr. Baski, however, Mr. Lovecchio refused to do so and stated that Defendant would receive six months of probation for signing the current agreement. (*Id.*). Mr. Baski states that he urged Defendant to sign the Agreement based upon this representation. (*Id.*). He maintains that Defendant never read the Agreement, despite her representations to the contrary at her guilty plea. (*Id.*). He further avers that Mr. Lovecchio did not explain sentencing guidelines to Defendant, nor did he "discuss anything about her federal criminal case." (*Id*). Finally, he states that Mr. Lovecchio told Defendant to "agree with the Judge" during her guilty plea. (*Id.* at 2).

While Mr. Baski's in-court testimony largely mirrored his submitted affidavit, we must note that we were deeply troubled by it all the same. It was clear to the Court that Mr. Baski was being coached, either by the Defendant or by someone else, during the course of his testimony.[1] (Doc. 149 at 33:20-35:1 ("THE COURT: Now let me just tell you something. I want to stop this. I can hear Ms.

---

[1] As this evidentiary hearing took place during the global coronavirus pandemic, the parties agreed to conduct the proceeding via WebEx. As such, it was understood that Mr. Baski would be testifying from the Defendant's home for ease of communication, but it was clearly explained to all involved that he must be alone while testifying.

Cicchiello coaching the witness in the background. Mr. Sample, this is unconscionable. This has become a mockery. Now I'm telling you right now, you better get in touch with Ms. Cicchiello. She's audibly coaching the witness. And I'm going to state that on the record.")). We do not countenance such grossly inappropriate behavior, and Defendant's counsel, quite rightly, quickly ended his direct examination of this witness.

In response, the Government called Mr. Lovecchio, who testified that he had reviewed the details of the Agreement with Defendant. (Doc. 149 at 38:2-38:9). He further testified that he would have answered any of the Defendant's questions about the agreement and stated that he was "actually pretty excited" when Defendant was sentenced to 72 months imprisonment because he knew that the Government was seeking the statutory maximum of 120 months. (*Id.* at 38:22-39:15). Additionally, Mr. Lovecchio denied ever promising the Defendant a certain sentence, stating that he "never guarantee[s]" because "[i]t's ultimately up to the judge." (*Id.* at 40:15-40:19). He stated that Defendant understood the advisory nature of the guidelines and that the judge had ultimate discretion. (*Id.* at 40:25-41:12). On cross examination, Mr. Lovecchio testified that he never spoke to Defendant about potentially receiving probation, stating that "it was never a possibility." (*Id.* at 42:17-42:24).

Defendant called Joan Gibbons as a rebuttal witness,[2] who stated that Mr. Lovecchio had confirmed to her that Defendant would receive six months probation for pleading guilty.[3] (*Id.* at 52:21-23). During the Court's questioning of this witness, we asked Ms. Gibbons if Defendant "reads things carefully" and again heard someone coaching the witness in her answer. (*Id.* at 56:4-57:13). Indeed, even Defendant's own counsel confirmed that he had heard another person in the room with Ms. Gibbons telling her how to answer. (*Id.* at 57:13-58:14).[4] We

---

[2] We are also in receipt of an affidavit filed by Ms. Gibbons, which is identical to her testimony in all relevant respects. (Doc. 112-1).

[3] Like Mr. Baski, Ms. Gibbons was also involved in the offense conduct. (Doc. 149 54:25-55-12 ("MR. TERZ: In fact, you were more than just privy to the circumstances, Ms. Gibbons, you were interviewed by federal agents. Is that correct? MS. GIBBONS: Yes, the FBI came to my house and scared the hell out of me. MR. TERZ: Right. And in fact, you were actually working for Ms. Cicchiello as part of the Twilight Beginnings operation. Is that correct? MS. GIBBONS: I did for a very short time, yes. That's how I knew what was going on. MR. TERZ: And in fact, you had received a subpoena to testify in court for the upcoming trial. Is that correct? MS. GIBBONS: Yes, I did")).

[4]
| | |
|---|---|
| THE COURT: | We're not going to go any further with this because I heard somebody coaching the witness in the background. I want to state that on the record. |
| MS. GIBBONS: | It's only me, I'm sorry. I'm having a lot of feedback on this. |
| THE COURT: | Ms. Gibbons, who's in the room with you? |
| MS. GIBBONS: | No one. |
| THE COURT: | Was there someone in the room a minute ago? |
| MS. GIBBONS: | No. |
| THE COURT: | You're under oath. |
| THE WITNESS: | Not that I know. |
| THE COURT: | Yeah. So if I heard somebody talking in the background, that was a ghost, that wasn't a person in the room. Is that right? |
| MS. GIBBONS: | She's not in the room, no. She's in the kitchen cooking. |
| THE COURT: | I didn't say who was in the room, I said, somebody in the room. |
| MS. GIBBONS: | No. |
| MR. TERZ: | Your Honor, just for the record, I distinctly heard someone in response to your question whispering no to your last question. |

8

thus promptly ended this witness's testimony as well. As we are permitted to do in §2255 hearings, we take this blatant coaching of both Ms. Gibbons and Mr. Baski into account as we weigh the credibility of these witnesses' testimony. Neither party indicated a desire to file post-hearing submissions, and this matter is thus ripe for review.

## II. STANDARDS OF REVIEW

### a. Section 2255

A federal prisoner in custody under the sentence of a federal court may, within one year from when the judgment becomes final, move the sentencing court to "vacate, set aside, or correct" a sentence "imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). A federal prisoner may also file a § 2255 motion within one year from "[t]he date on which the right asserted was initially recognized by the Supreme Court, if that right was newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." 28 U.S.C. § 2255(f)(3). A § 2255 motion may attack a federal prisoner's sentence on any of the following grounds: (1) the judgment was rendered without jurisdiction; (2) the sentence imposed was not authorized by law or

---

| | |
|---|---|
| THE COURT: | So did I. So did I. That's why I'm not going to ask anymore questions because this is – |
| MR. SAMPLE: | I heard it, too, Judge. |
| THE COURT: | I'm done. All right. |

otherwise open to collateral attack; or (3) there has been such a denial or infringement of the Constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack. 28 U.S.C. § 2255(b).

Section 2255 does not, however, afford a remedy for all errors that may have been made at trial or sentencing. *United States v. Essig*, 10 F.3d 968, 977 n.25 (3d Cir. 1993). Rather, § 2255 permits relief for an error of law or fact constituting a "fundamental defect which inherently results in complete miscarriage of justice." *United States v. Eakman,* 378 F.3d 294, 298 (3d Cir. 2004) (citing *United States v. Addonizio,* 442 U.S. 178, 185, 99 S. Ct. 2235, 60 L. Ed. 2d 805 (1979)). If the court determines that the sentence was not authorized by law, was unconstitutional, or is otherwise open to collateral attack, the court may vacate the judgment, resentence the prisoner, or grant the prisoner a new trial as appropriate. See 28 U.S.C. § 2255(b). "Generally, if a prisoner's § 2255 [motion] raises an issue of material fact, the district court must hold a hearing to determine the truth of the allegations." *Essig,* 10 F.3d at 976 (citations omitted). The petitioner carries the burden of proof in Section 2255 proceedings. *United States v. Hollis,* 569 F.2d 199, 205 (3d Cir. 1977).

### b.  Ineffective Assistance of Counsel

Because one of Defendant's sole grounds for relief concerns allegations of ineffective assistance of counsel, we also state the well-established standard for

such claims under 28 U.S.C. § 2255. In order to successfully demonstrate ineffective assistance of counsel, a petitioner must establish that (1) the performance of counsel fell below an objective standard of reasonableness; and (2) the errors of counsel prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-92, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The first prong of the *Strickland* test requires the defendant show that counsel's performance was actually deficient. *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001). A court "deciding an actual ineffectiveness claim must judge the reasonableness of the counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. Counsel's conduct presumptively "falls within the wide range of reasonable professional assistance," and the defendant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id*. at 689-90 (quoting *Michel v. Louisiana*, 350 U.S. 91, 93, 76 S. Ct. 158, 100 L. Ed. 83 (1955)).

      The Supreme Court has cautioned against allowing defendants to "second-guess" every decision made by their representative. *Strickland*, 466 U.S. at 689. Every effort must "be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. There is a "strong

11

presumption" that the actions of defense counsel were reasonable, and the burden rests with the defendant to overcome this high bar. *Id.* at 689. Furthermore, it is imperative that post-trial or post-plea inquiries not lead to an endless cycle of litigation, where the accused can challenge the result until he finds the one most favorable. See *id.* at 689–90.

The second prong of the *Strickland* test requires the defendant show that the deficient performance so prejudiced the defense as to raise doubt as to the accuracy of the outcome of the trial or sentence. *Strickland*, 466 U.S. at 693-94. Additionally, it "is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693; *Harrington v. Richet*, 562 U.S. 86, 111 (2011) (emphasizing recently that the "likelihood of a different result must be substantial, not just conceivable"). The petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Jermyn*, 266 F.3d at 282 (quoting *Strickland*, 466 U.S. at 693). A simple error, if it had no effect on the judgment, does not necessitate setting aside the judgment. *Strickland*, 466 U.S. at 691.

### III. DISCUSSION

Defendant makes two arguments in favor of relief. First, she argues that her guilty plea "was unknowing and involuntary due to an unkept promise." (Doc. 128

at 7). Second, she argues that her guilty plea "was the product of ineffective assistance of counsel." (*Id*.). We take each in turn.[5]

### a. Involuntary Plea

In support of this claim, Defendant cites myriad cases which allowed criminal defendants to collaterally attack involuntary pleas. *See* Doc.128 at 6. In each of these cases, the court found that "specific and corroborated allegations" were present which showed attorney misrepresentations or failures to explain the full ramifications of a guilty plea. (*Id.*). Defendant argues that her case is analogous to these successful §2255 petitions because she has "offered a declaration from a third-party that confirms the promise by Lovecchio that Chicchiello would receive six months of probation by pleading guilty." (*Id*. at 6-7). While such alleged corroboration was clearly enough to win her an evidentiary hearing, Defendant carries the burden of proof on these allegations to ultimately win the day. She has failed to meet that burden.

In sole support of her alleged promise, she has presented the testimony of two unindicted co-conspirators who were audibly directed to give answers favorable to the Defendant during the evidentiary hearing. *See supra* pp. 6-9. We

---

[5] We note that Defendant's briefing is geared toward obtaining an evidentiary hearing on her claims. (Doc.137 at 1 ("The solitary issue before the Court is whether Joan Chicchiello should be granted an evidentiary hearing on her 28 U.S.C. allegation.")). However, out of an abundance of caution, and because Defendant declined to file a post-hearing submission, (Doc. 149 at 57:20-57:25), we construe her arguments in favor of procuring a hearing as supporting her ultimate claim for relief as well.

cannot countenance such behavior, and we ascribe little weight to the testimony of both Mr. Baski and Ms. Gibbons. Indeed, their testimony made these proceedings into a bad joke.

Moreover, beyond the dearth of evidence Defendant has presented in favor of her version of events, we see a great many facts which contradict her story. First, in the face of our explicit questioning during her guilty plea, which asked whether she was promised anything outside the terms of the Agreement, Defendant unequivocally answered: "No." (Doc 136 at 10:13-16). Defendant now maintains that she "just agree[d] with the judge" so her deal wouldn't fall through. (Doc. 149 at 8:1-8:16).  But the Third Circuit has contemplated just such a situation, holding that a §2255 *hearing* may not even be necessary when the guilty plea record shows that "the defendant states that no promise, representation, agreement or understanding was made or that none other than that disclosed in open court was made to him by any person prior to the entry of the plea, , and (2) the defendant affirmatively states that no out-of-court promise, representation, agreement or understanding required the defendant to respond untruthfully or contrary to the terms thereof in the in-court plea reception proceedings, and (3) that the defendant understands that he may not at a later time contend that any promise, representation, agreement or understanding was made by any person other than that set forth in open court." *United States v. Valenciano*, 495 F.2d 585, 587–88

(3d Cir. 1974). We have a thorough record before us evidencing that Defendant acknowledged that there were no out-of-court promises made to her beyond the terms of the agreement. We also note that the Court emphasized the importance of telling the truth throughout those proceedings, informing Defendant of the potential perjury penalties she could face otherwise. (Doc. 136 at 3:5-3:11). Indeed, Defendant affirmatively stated she would tell the truth throughout her guilty plea. (*Id.* at 3:11). Third Circuit precedent thus favors Defendants' plea as knowing and voluntary, despite Defendant's protestations to the contrary. Defendant is a well-educated adult, (Doc. 85 at ¶¶ 69-72), and without some specific, proven allegation that she was lied to or misled, we assume that she understood our questions and answered them truthfully.

Second, we note that Defendant's Pre-Sentence Report indicates she was "ineligible" for probation per USSG §5B1.1. (Doc. 85 at ¶ 94). This underscores Mr. Lovecchio's testimony that probation was "never a possibility" that he would have discussed with Defendant. (Doc. 149 at 42:17-42:24).[6] Furthermore, Defendant's own actions at the time of her sentencing indicate that even she expected to go to prison for a period of time. During sentencing, the Court

---

[6] In light of the numerous instances during Defendant's guilty plea when it was emphasized that the Court had ultimate discretion to sentence Defendant as we saw fit, we also credit Mr. Lovecchio's testimony that he "never guarantee[s]" a specific sentence because "[i]t's ultimately up to the judge." (Doc. 149 at 40:15-40:19).

15

indicated that it was amenable to a voluntary surrender date, but Defendant stated through counsel that she wished to report *that day*. (Doc. 108 at 15:16-18). Indeed, Defendant had specific requests as to the location of her imprisonment. (*Id.* at 15:18-20). It beggars belief that Defendant would genuinely expect to be sentenced to six months' probation but simultaneously ask her counsel to request a specific prison location.

In the face of Defendant's unreliable witnesses, her own words and actions during her guilty plea and sentencing, and the legal framework of her thoroughly-explained criminal case, we cannot find that Defendant has carried her burden of showing that her plea was an involuntary one. In fact, all evidence indicates that Defendant had the benefit of an excellent lawyer who meticulously explained her limited legal options to her. That Defendant later regretted her actions and wished to escape their consequences is of no moment.

### b. Ineffective Assistance of Counsel

Next, Defendant argues "that her guilty plea was the product of ineffective assistance of counsel." (Doc. 128 at 7). While Defendant does not address the two well-known *Strickland* factors applicable to this claim, she does cite a Tenth Circuit case which holds that "an attorney who makes 'firm and reckless assurances as to the consequences of h[e]r plea, and moreover, that [t]he [defendant] relied on those assurances in choosing to waive his [*sic*] right to trial,

he [*sic*] would likely be entitled to relief.'" (*Id.* (citing *United States v. Gonzalez*, 98 Fed.Appx. 825, 830 (10th Cir. 2004) (internal citations omitted))). Again, Defendant maintains that her own testimony, corroborated by that of Mr. Baski and Ms. Gibbons, supports her claim.[7]

    But this argument must fail as well. To be sure, if Defendant *could* prove that Mr. Lovecchio had promised she would receive six months' probation for pleading guilty, she may well be able to show both deficient performance and prejudice. But, as stated above, she cannot do so. We decline to find Mr. Lovecchio's performance was anything less than perfectly sufficient when Defendant has proffered no credible evidence to convince us otherwise. Again, we cannot credit the testimony of witnesses when we could clearly hear a third-party whispering the "correct" answers in their ears. Instead, we revert to Defendant's on-the-record statements that she was satisfied with Mr. Lovecchio's representation and that he had thoroughly explained all the relevant respects of her case. (Doc. 180 at 5:21-22 ("Then I went to see Attorney Lovecchio, he's been forthcoming and explains everything to me."); Doc. 136 at 4:10-18). Defendant cannot now cry foul because she is displeased with her situation. Her attempt to orchestrate an escape from her justly imposed sentence by throwing her able attorney to the wolves has proven ineffective.

---

[7]    The Government did not respond to this claim in their briefing.

## IV. CONCLUSION

Defendant has failed to adduce any credible evidence upon which we could grant her petition. Her actions at the time of both her guilty plea and sentencing indicate that she understood she was subject to statutory maximum terms of imprisonment and was not surprised when she was subsequently handed over to the custody of the Bureau of Prisons. Indeed, contrived testimony of her associates does nothing to sway us in this regard. If anything, it has opened both Defendant and her unindicted co-conspirators, Mr. Baski and Ms. Gibbons, to further charges from the United States Attorney for the Middle District of Pennsylvania. It is our view that the record of the evidentiary hearing in this matter can support appropriate charges of perjury and witness tampering and will promptly refer the matter for further review.